REVISED AUGUST 22, 2002

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-50523

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON BERNARD and CHRISTOPHER ANDRE VIALVA,

Defendants - Appellants.

Appeals from the United States District Court
for the Western District of Texas
Waco Division

July 19, 2002

Before JONES, WIENER and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Brandon Bernard and Christopher Andre Vialva were jointly tried, found guilty and sentenced to death for the murders of Todd and Stacie Bagley on the property of Fort Hood, Texas. See Federal Death Penalty Act ("FDPA") of 1994, 18 U.S.C. § 3591 et seq. Bernard and Vialva now appeal their convictions and sentences. Finding no reversible error, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On June 20, 1999, Christopher Andre Vialva, Christopher Lewis and Tony Sparks, members of a gang in Killeen, Texas, met to plan a robbery.[1]  The three gang members decided on the following plan: they would ask someone for a ride, get in the car and pull a gun on the victim, steal the victim's money and personal effects, obtain the pin number for the victim's ATM card, force the victim into the trunk of the car and drive somewhere to abandon the car with the victim locked in the trunk.

The following day, Vialva, Lewis and Sparks enlisted two fellow gang members, Brandon Bernard and Terry Brown, to assist in the carjacking plan.  Initially, the group only had one gun, a "tiny .22 pistol" that they considered "too small to frighten anyone."  The group decided that a second gun was necessary. Bernard owned a Glock .40 caliber handgun that he had lent to Gregory Lynch.  Vialva, Bernard, Lewis, Sparks and Brown drove to Lynch's house and obtained Bernard's gun.  The group then set out in search of a victim.

Sometime after 2:00 p.m. on the afternoon of June 21, Bernard drove Vialva, Brown, Lewis and Sparks to a local supermarket to find a victim.  Having had no luck there, the group

---

[1]     Most of the facts concerning the events of June 20-21 were testified to by Christopher Lewis and Terry Brown, who pled guilty to various offenses in exchange for truthful testimony.

continued their search by driving around parking lots at other local stores. The search ended at a convenience store in Killeen, where they found Todd Bagley using a pay phone.

Todd Bagley and his wife, Stacie, were youth ministers from Iowa. Before moving to Iowa, Todd had been stationed at Fort Hood, where the couple attended Grace Christian Church and worked with the youth group. About a week before their deaths, the Bagleys returned to Killeen to visit friends and to attend a revival meeting at the church. On Sunday, June 21, they attended a morning worship service and had lunch with friends. Afterward, Todd stopped at "Mickey's" convenience store to use the payphone, while Stacie waited for him in their car.

Lewis and Sparks approached Todd and asked him for a ride to their uncle's house. Todd agreed. Vialva, who was standing nearby, got in the backseat of the Bagleys' car with Lewis and Sparks.[2] Todd and Stacie occupied the front seat. Vialva gave Todd directions, and then pulled out the .40 caliber gun, pointed it at Todd and told him that "the plans have changed." At the same time, Sparks pointed the .22 handgun at Stacie. On Vialva's orders, Todd stopped the car, and the Bagleys got out. The gang stole Todd's wallet, Stacie's purse and the Bagleys' jewelry.

---

[2] Bernard and Brown were playing video games in a nearby store. They rejoined Vialva later in the day.

3

Vialva demanded the pin numbers for the Bagleys' ATM cards, and then forced the Bagleys into the trunk of their car.

After locking the Bagleys in the trunk, Vialva drove around for several hours. He went to ATM machines to withdraw money from the Bagleys' account, but was largely unsuccessful because the Bagleys had less than one hundred dollars on deposit. Vialva drove to a "Wendy's" where Lewis and Sparks used the Bagleys' money to purchase some food. Vialva then attempted to pawn Stacie's wedding ring, and stopped at a tobacco store to purchase cigars and cigarettes.

While they were locked in the trunk, the Bagleys spoke with Lewis and Sparks through the rear panel of the car. Lewis testified that the Bagleys asked them questions about God, Jesus and church. The Bagleys told Lewis and Sparks that they were not wealthy people, but that they were blessed by their faith in Jesus. The Bagleys informed Lewis and Sparks about the revival meeting at Grace Christian, a church which Lewis said he had attended. Urging them to have faith, the Bagleys advised Lewis and Sparks that God's blessings were available to anyone. After this conversation, Sparks told Vialva he no longer wanted to go through with the crime. Vialva, however, insisted on killing the Bagleys and burning their car to eliminate the witnesses and the gangs' fingerprints.

4

Vialva drove to his house. While he was inside, the Bagleys had another conversation about God with Lewis and Sparks. By this time, the victims had been locked in the trunk for several hours. The Bagleys pleaded with Lewis and Sparks for their lives.

Vialva returned to the car with a ski mask and some additional clothing. Vialva, Lewis and Sparks then met Bernard and Brown, and Vialva repeated that he had to kill the Bagleys because they had seen his face. Bernard and Brown set off to purchase fuel to burn the Bagleys' car.

Vialva, Bernard, Lewis and Brown[3] drove to an isolated spot in the Belton Lake Recreation Area on the Fort Hood military reservation. Vialva parked the Bagleys' car on top of a little hill. Brown and Bernard poured lighter fluid on the interior of the car while the Bagleys sang and prayed in the trunk.

According to Brown, Stacie's last words were "Jesus loves you" and "Jesus, take care of us." Vialva crudely cussed at her in reply. Vialva put on his mask, and told Lewis to open the trunk. Vialva then shot Todd in the head with the .40 caliber gun, killing him instantly. Vialva shot Stacie in the right side of her face, knocking her unconscious, but not killing her. Bernard set the car

---

[3] Sparks was no longer with the group. He was dropped off earlier in the evening to avoid missing his curfew.

on fire.  An autopsy later revealed that Stacie died from smoke inhalation.[4]

Vialva, Bernard, Lewis and Brown ran down the hill to Bernard's car.  Their getaway was foiled when the car slid off the road into a muddy ditch.  Local law enforcement officers, informed of a fire, arrived at the scene while the assailants were trying to push the car out of the ditch.  When firemen discovered the bodies in the trunk of the Bagleys' burning car, the four were arrested.

A grand jury in the Western District of Texas indicted appellants Vialva and Bernard for the following crimes: carjacking and aiding and abetting the same in violation of 18 U.S.C. §§ 2, 2119 ("Count One"); conspiracy to commit murder in violation of 18 U.S.C. §§ 1111, 1117 ("Count Two"); the murder of Todd Bagley, within the special maritime and territorial jurisdiction of the United States, and aiding and abetting the same in violation of 18 U.S.C. §§ 2, 1111 ("Count Three"); and the murder of Stacie L. Bagley, within the special maritime and territorial jurisdiction of the United States, and aiding and abetting the same in violation of 18 U.S.C. §§ 2, 1111 ("Count Four").  The government gave notice it would seek the death penalty.

---

[4]     An autopsy revealed soot in Stacie's larynx, trachea and bronchi indicating her inhalation of smoke.  A toxicologic examination of Stacie's blood revealed a high level of carbon monoxide, the product of breathing smoke carbon monoxide gas from the burning car.

6

On June 1, 2000, a jury found Vialva and Bernard guilty on all four counts of the indictment. Testimony in the punishment phase of the trial began on June 8 and lasted four days. On June 13, the jury recommended a sentence of death against Vialva on Counts One, Three and Four, and a sentence of death against Bernard on Count Four. The district court sentenced Vialva to life imprisonment on Count Two and death on the remaining counts. The court sentenced Bernard to life imprisonment on Counts One, Two and Three and death on Count Four. Bernard and Vialva filed timely notices of appeal.

## II.  DISCUSSION

In this direct appeal, Bernard and Vialva challenge their convictions and sentences on the following grounds:

A. The district court violated Vialva's Due Process rights by improperly dismissing a prospective juror for cause;

B. The district court violated Vialva's Due Process rights and Fed. R. Civ. P. 14 by failing to order a severance and a mistrial sua sponte in the punishment phase of trial;

C. The district court failed to conduct an adequate investigation into alleged communications between a third party and jurors;

D. The district court violated Appellants' First Amendment, Eighth Amendment and Due Process rights and 18 U.S.C.

7

§ 3593(c) and § 3593(f) by admitting victim impact statements containing improper references to religion and improper characterizations of Appellants and their crimes;

E. The district court improperly defined certain aggravating factors in its instructions to the jury, and the evidence is legally insufficient to support the jury's findings regarding three aggravating factors;

F. Appellants' death sentences violate the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A) because the jury arbitrarily found that Appellants' ages were not mitigating factors;

G. The district court violated Vialva's Eighth and Fourteenth Amendment rights and 18 U.S.C. § 3593(c) by excluding mitigating testimony concerning a childhood incident of racial harassment;

H. Prosecutorial statements in closing argument denied Vialva a fair trial and violated his Due Process rights.

I. The cumulative impact of errors in the punishment phase of trial denied Vialva a fair trial.

J. Bernard's sentence violates the Fifth, Sixth and Eight Amendments because the "mental state factors" and

8

"statutory aggravating factors" were not found by the grand jury or alleged in the indictment. We address each of these issues in turn.

## A. Dismissal of a prospective juror for cause.

Vialva contends that the district court erred by sustaining the government's challenge to prospective juror Dana Pate on the basis of her inability to consider the penalty of death. In her initial questionnaire, the prospective juror stated, "I do not feel I have the right to judge whether a person lives or dies. I could not do that." When asked about this statement during voir dire, however, the prospective juror indicated that she had changed her mind about the death penalty. She explained to the court, "this is a real hard thing for me . . . I've talked to some people, and we've talked about [the death penalty], and I still don't know if I'm right or not, but if the facts were such that they were proven that the defendant would need that verdict, then I would give it." The government made and the district court sustained a for-cause objection to Ms. Pate on the basis of her inability to adequately consider the death penalty. Vialva argues that the district court erred because the prospective juror expressed a willingness to consider the death penalty in appropriate cases.

9

"A court may excuse a prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instruction and oath." United States v. Webster, 162 F.3d 308, 340 (5th Cir. 1999) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844 (1985)). A prospective juror who would "automatically vote against the death penalty in every case" must be dismissed. Id. (citing United States v. Flores, 63 F.3d 1342, 1355 (5th Cir. 1995)). Additionally, the district court has discretion to excuse a juror for cause when the court "is left with the definite impression that a prospective juror who would be unable to faithfully and impartially apply the law." Id., (quoting Witt, 469 U.S. at 426, 105 S.Ct. 844). While the district court's dismissal of a prospective juror on this basis is reviewed for abuse of discretion, we give the court "considerable deference [] because such decisions are based on face-to-face credibility assessments." Webster, 162 F.3d at 340.

The record supports the district court's decision. Ms. Pate's initial questionnaire revealed unequivocally that she could not sentence another person to death. When questioned during voir dire, the potential juror explained that under limited circumstances she would be able to sentence another person to death, but she also stated "I cannot be sure. . . . I cannot be

10

sure about this."  These statements and others in the record support the district court's conclusion that the prospective juror's bias regarding the death penalty substantially impaired her ability to abide by her oath as a juror.  The district court did not abuse its discretion in dismissing Ms. Pate.

## B.  Severance

Vialva urges that the trial court should have severed his case from Bernard's at the penalty phase of trial.  See Fed. R. Crim P. 14.  According to Vialva, evidence of Bernard's religious conversion and Christian upbringing implicitly prejudiced the jury against Vialva, who lacked comparable mitigating evidence.  Vialva contends that Bernard's mitigating evidence regarding his Christianity violated Vialva's right to exclude consideration of religion during the penalty phase of trial.  Vialva concedes that this issue must be reviewed for plain error, since he did not object to Bernard's evidence and failed to renew an unsuccessful pretrial motion for severance.  United States v. Misher, 99 F.3d 664, 669 (5th Cir. 1996).[5]

---

[5]  Vialva, but not Bernard, moved to sever the trials at the outset of the proceedings and again during jury selection.  The motions were denied.  We are not faced with any broad question concerning the advisability of joint trials in federal capital cases, but we note that the Federal Death Penalty Act contains no special rules regarding joinder of codefendants.

11

Reversal may occur under the demanding plain error standard only if there was (1) clear or obvious (2) error that (3) affected Vialva's substantial rights, and (4) failure to correct the error seriously affects the fairness, integrity or public reputation of the judicial proceedings. United States v. Olano, 507 U.S. 725, 730-37, 113 S.Ct. 1770 (1993). Vialva cannot satisfy the standard.

No clear error attached to the district court's failure sua sponte to sever and grant a mistrial when Bernard offered a bit of evidence of his Christian conversion. The decision to sever lies in the trial court's discretion. Severance "should" be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants." Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933 (1993). A court's limiting instructions will often cure any prejudice resulting from a joint trial. Id. Further, defendants charged with capital murder under federal statutes have been tried jointly in both the guilt and penalty phases of trial. See United States v. Causey, 185 F.3d 407 (5th Cir. 1999); United States v. Tipton, 90 F.3d 861 (4th Cir. 1996).

While acknowledging that efficiency factors support joint trials even in capital cases, we share Vialva's concern over the inherent tension between joinder and each defendant's

12

constitutional entitlement to an individualized capital sentencing decision. A trial court must be especially sensitive to the existence of such tension in capital cases, which demand a heightened degree of reliability. Lowenfield v. Phelps, 484 U.S. 231, 238-39, 108 S.Ct. 546 (1988); see generally Tipton, 90 F.3d at 891-92 (discussing problems posed by joinder in the penalty phase of a federal capital case, but noting that since the federal statute requires the sentencing decision to be made by the jury that tried the defendants' guilt, severance during the penalty phase is impractical.) Nevertheless, the pro-Bernard mitigating evidence of which Vialva complains was not sufficiently "mutually antagonistic" or "irreconcilable" to him to suggest, much less compel, severance at the penalty phase.

Bernard's mitigating evidence was admissible and not subject to challenge by Vialva. Viewed objectively, however, Bernard did not offer strong proof of his religious conversion. One friend testified briefly that Bernard had "found the Lord" while in jail for these crimes. And Bernard's mother, pleading for her son's life, testified that she tried to instill in Bernard Christian principles. Considering the circumstances of the crime, her plea appears desperate. None of this evidence tarred Vialva directly or indirectly, particularly since it was evident that Vialva was not responsible for the fractured home life of his

13

youth. The evidence generated no "specific and compelling" prejudice to Vialva.

Finally, the court repeatedly instructed the jury to consider each defendant's punishment separately, and he instructed them, as required by the FDPA, not to consider the religious views of the defendants or victims. This instruction refutes Vialva's complaint that the court should have issued an additional, sua sponte instruction that evidence of Bernard's religious upbringing or conversion should not be considered in assessing Vialva's punishment. This court must presume that the jury heard, understood and followed the district court's instructions. Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702 (1987). The district court's instructions sufficiently addressed the risk of prejudice resulting from the joint trial. The court did not plainly err by failing to order severance during the punishment phase of trial.

### C.  Alleged Third-Party Communication with Jurors

Before closing arguments in the guilt-innocense phase of trial, the district court told counsel: "a juror said as they came past where some people were out on the sidewalk this morning, and some person they described as a 'Black lady,' said to them, 'Someone is going to die in that trial today.' So, if you notice

14

some extra security or something today, that will be the reason." The record reflects no response from any of the parties. Bernard now contends that the court conducted an insufficient inquiry into this alleged incident, and the court erred in believing that the jury had not been tainted by the third-party communication.

We review the court's decision that the jury was not improperly tainted by extrinsic evidence under the clearly erroneous standard, and we review the court's choice of methods to investigate the possibility of extrinsic taint for abuse of discretion. United States v. Cantu, 167 F.3d 198, 201 (5th Cir. 1999) (citations omitted).[6] Bernard argues that the district court abused its discretion by discussing this alleged communication with the juror *ex parte.* Relying on Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450 (1954), and other jury tampering cases, Bernard argues that the district court committed reversible error by failing to conduct a hearing to investigate this incident.

This court has explained, however, that district courts are not required to conduct a "full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury.'" Cantu, 167 F.3d at 201-02 (quoting United

---

[6] Because Bernard failed to object to the district court's announcement and did not move for a mistrial, plain error review might be appropriate. Nevertheless, because we find no clear error or abuse of discretion, it is unnecessary to determine whether the plain error standard is required.

15

States v. Ramos, 71 F.3d 1150, 1153 (5th Cir. 1995)); see also, United States v. Sylvester, 143 F.3d 923, 932 n.5 (5th Cir. 1998). To determine whether a hearing is necessary, the district court "must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct." Ramos, 71 F.3d at 1153 (5th Cir. 1995).

In this case, the passing statement of a crowd member was minimally prejudicial, even if it is assumed to have been intended to influence the jury. The effect of her statement would have been greatly outweighed by the disruption and prejudice of an evidentiary hearing. This conclusion is underscored by the absence of any request for further investigation or a request for a mistrial. The district court's failure to investigate further or differently was not an abuse of discretion. Likewise, its conclusion that the jury was not improperly tainted is not clearly erroneous. Bernard's argument is without merit.[7]

**D. Victim Impact Statements**

---

[7] Bernard further inaptly asserts that his counsel had a right to be present at the court's "ex parte conference" with the juror. The context of the court's statement to counsel suggests that a juror simply mentioned the passerby's comment to him. Again, the fact that no attorney present responded to the court's announcement strongly indicates the triviality of the incident.

16

Appellants next contend that the district court erred by admitting certain parts of the victim impact statements in the penalty phase of trial. Not only do they allege that the victim impact statements were unduly prejudicial, in violation of their Due Process rights, but also that they contained improper references to religion and improper characterizations of the perpetrators and their crimes. Bernard and Vialva concede that since they did not object to the victim impact statements at trial, this court's review is for plain error. See, e.g., Jones v. United States, 527 U.S. 373, 387-88, 119 S.Ct. 2090 (1999).

The FDPA provides for the submission of an aggravating factor "concerning the effect of the offense on the victim and the victim's family [which] may include oral testimony, a victim impact statement . . . and any other relevant information." 18 U.S.C. § 3593(a)(2). Victim impact evidence is relevant to the jury's sentencing decision. Accordingly, testimony concerning the effect of the murders on the victims and their parents was offered in support of this aggravating factor.

In Payne v. Tennessee, the Supreme Court held that victim impact evidence is admissible "to show [] each victim's uniqueness as an individual human being." 501 U.S. 808, 823-27, 111 S.Ct. 2597 (1991). "Victim impact evidence is [a] method of informing the sentencing authority about the specific harm caused by the

17

crime in question, evidence of a general type long considered by sentencing authorities." Id. at 825, 111 S.Ct. 2597. Evidence "about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." Id. at 827, 111 S.Ct. at 2597. Victim impact evidence is admissible unless it "is so unduly prejudicial that it renders the trial fundamentally unfair" in violation of a defendant's Due Process rights. Id. at 825, 111 S.Ct. 2597; see also, Jones v. United States, 527 U.S. 373, 401-02, 119 S.Ct. 2090 (1999).[8]

The Government offered five victim impact statements in the sentencing phase of trial. The four parents' statements were

---

[8]     Prior to its opinion in Payne, the Court had held victim impact statements inadmissible on the basis that they created an "impermissible risk that the capital sentencing decision [would] be made in an arbitrary manner" in violation of the Eighth Amendment. Booth v. Maryland, 482 U.S. 496, 505, 107 S.Ct. 2529 (1987); see also, South Carolina v. Gathers, 490 U.S. 805, 810, 109 S.Ct. 2207 (1989) (extending Booth to prosecutorial arguments concerning the character of the victim or the impact of the crime on the victim's family). The holdings of Booth and Gathers rested on the reasoning that victim impact evidence is "wholly unrelated to the blameworthiness of a particular defendant." Booth, 482 U.S. at 505, 107 S.Ct. 2529.
        In Payne, the Court determined that Booth had "unfairly weighted the scales in a capital trial" in favor of the defendant. Payne, 501 U.S. at 822, 111 S.Ct. 2597. "By turning the victim into a 'faceless stranger at the penalty phase of a capital trial,' Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." Id. at 825, 111 S.Ct. at 2597. Overruling Booth and Gathers to this extent, the Court explained that victim impact evidence is relevant to the defendant's moral culpability, and it counterbalances the defendant's mitigating evidence with evidence that humanizes the victim. Id.

18

admissible under <u>Payne</u> to show the impact of the murders on the victims' families. 501 U.S. at 827, 111 S.Ct. at 2609. The fifth statement was made by a friend and former coworker of the Bagleys and demonstrated their "uniqueness as [] individual human being[s]." <u>Id.</u> at 823, 111 S.Ct. at 2607. The statements in this case are similar to those held admissible in other cases. <u>See</u>, <u>e.g.</u>, <u>United States v. Hall</u>, 152 F.3d 381, 404-05 (5th Cir. 1998), *abrogated on other grounds by*, <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 120 S.Ct. 774 (2000); <u>United States v. McVeigh</u>, 153 F.3d 1166, 1218-19 (10th Cir. 1998).

Bernard's and Vialva's multiple challenges to the victim impact statements resolve analytically into two issues: whether the witnesses' religious statements and references deprived appellants of a fair trial; and whether portions of the victim impact statements went beyond the limits of <u>Payne</u> by injecting into evidence irrelevant and prejudicial characterizations of the crime and the Appellants.[9]

### 1.    Religious Statements in the Victim Impact Testimony

---

[9]    Appellants also challenge Todd Bagley's father's statement that described the emotional harm resulting from his observation of the trial, which revealed the brutality of the crime. Appellants argue that Bagley's statement was irrelevant to the harm caused by the Appellants. This single short paragraph of Mr. Bagley's statement "did not inflame [the jury's] passions more than did the facts of the crime . . . . In light of the jury's unavoidable familiarity with the facts," we cannot conclude that Mr. Bagley's brief statement deprived Appellants of Due Process. <u>Payne</u>, 501 U.S. at 832, 111 S.Ct. at 2612 (O'Connor, J., concurring).

19

Appellants argue that religious references in the victim impact testimony violated their First Amendment, Eighth Amendment and Due Process rights and contravene provisions of the FDPA prohibiting the introduction of unduly prejudicial testimony. 18 U.S.C. §§ 3593(c) and 3595(c)(2)(A). Four types of religious references appear in the testimony: (1) descriptions of the religious beliefs and activities of Todd and Stacie Bagley; (2) the bereaved parents' statements that they relied on their own religious beliefs to find comfort from the pain caused by the murders; (3) a religious plea by Stacie's mother directed at Appellants; and (4) religious remarks by Thelma Bernard, appellant's mother, when pleading for her son's life.

With regard to the first category of religious statements, we find no error in the introduction of testimony regarding the victims' religious activities. Payne holds that a court must consider the victims of an offense as it finds them, not in the light most favorable to the defendant. Indeed, concurring in Payne, Justice Souter described the "serious practical problems" caused by the Booth standard with a hypothetical illustration of a minister killed by a stranger while running an errand to his church. Payne, 501 U.S. at 840-42, 111 S.Ct. at 2616-17 (Souter, J., concurring). Justice Souter explained:

> The jury will not be kept [at the guilt phase] from knowing that the victim was a minister, with a wife and

20

child, on an errand to his church . . . because the usual standards of trial relevance afford factfinders enough information about surrounding circumstances to let them make sense of the narrowly material facts of the crime itself.  No one claims that jurors in a capital case should be deprived of such common contextual evidence. . . .

Id.  In this case, testimony regarding the religious activities of the Bagleys is "common contextual evidence."  The Bagleys were youth ministers who were attending a revival meeting at their former church on the day that they were murdered.  These contextual facts are not inadmissible simply because they concern religion.

In addition to being relevant contextual evidence, the fact that Todd and Stacie Bagley were "deeply religious and harmless individual[s] who exhibited [their] care for [their] community by religious proselytization . . . was relevant to the community's loss at [their] demise."  Gathers, 490 U.S. at 821, 109 S.Ct. at 2216 (O'Connor, J., dissenting).[10]  Because religion played a vital role in Todd and Stacie Bagleys' lives, it would be impossible to describe their "uniqueness as individual human beings" without reference to their faith.  See Pickren v. State, 500 S.E.2d 566, 568-69 (Ga. 1998) (finding description of victim's "faith and church activities an essential part of a 'glimpse into

_____

[10]    In Gathers, the Court had held inadmissible a prosecutorial argument containing numerous references to the religious beliefs and activities of the victim.  Gathers, 490 U.S. at 810-11, 109 S.Ct. at 2210-11.  By overruling Gathers, the Court has accepted Justice O'Connor's view that evidence relating to the victim's religious activities is relevant to the sentencing decision.

his life.'") (citations omitted). We find no error in admitting statements regarding the religious beliefs and activities of the victims.

The second category of religious statements includes the parents' reliance on their religious belief for comfort and relates to the harm caused by the Appellants' crime. Stacie Bagley's father, for example, explained that the only thing that made his daughter's tragic death bearable was his belief that he would see her again someday in heaven. Such statements are relevant to the impact of the Appellants' crimes on the victims' families. Thus, the statements are admissible under Payne.

We are troubled, however, that Stacie Bagley's mother, Donna McClure, addressed Bernard and Vialva personally during the course of her victim impact statement, warned them that heaven and hell are real, and called on them to put their faith in Jesus Christ for the forgiveness of their sins. Since these admonitions neither describe Todd and Stacie nor relate to the harm inflicted on Ms. McClure by appellants' crime, they were irrelevant and might have been excluded upon timely objection. Nevertheless, Appellants have failed to demonstrate that the admission of this testimony affected their substantial rights for purposes of the third prong of the plain error test. Unlike cases finding religious statements inadmissible, neither McClure nor any of the witnesses in this case

22

nor, most important, the prosecutor urged the jurors to use a religious standard in reaching their verdict. See, e.g., Sandoval v. Calderon, 241 F.3d 765, 776 (9th Cir. 2001) (stating that prosecutorial invocation of a "higher law or extra-judicial authority" in argument to jury violates the Eighth Amendment). In this case, the witness urged Appellants to put their faith in God. Precisely because such statements are not relevant to the jury's sentencing decision, we do not believe they could have inflamed or prejudiced the jury against appellants, they were not designed to do so, and in sum, such statements do not constitute plain error.

Vialva also complains that his right to a fair trial was violated when Bernard's mother, in mitigating testimony, urged the jurors to use a religious standard in their deliberations. This is the fourth type of religious reference complained of by Vialva. Bernard's mother, testifying on Bernard's behalf in the punishment phase, urged the jury to reject the death penalty because "Jesus wouldn't do lethal injection." As noted earlier, Bernard's mitigating evidence of his religious conversion was admissible. These statements generated no specific prejudice to Vialva, however, as Bernard's mother urged the jury to reject the death penalty. Furthermore, the court's instructions to the jury sufficiently addressed the risk of prejudice. The jurors also signed a certification, as required by the FDPA, that religion

23

played no part in their sentencing decision.  The statements of Bernard's mother did not deny Vialva a fair trial.

**2.    Characterization of the defendants and their crime**

Appellants also argue that portions of the victim impact testimony impermissibly characterized the Appellants and their crime.  In <u>Booth</u>, the Supreme Court held inadmissible victim impact testimony which "set[s] forth the family members' opinions and characterizations of the crimes and defendant[s]."  482 U.S. at 508-09, 107 S.Ct. at 2535-36.  The Court reasoned that "the formal presentation of [family members' opinions and characterization of the crime] can serve no other purpose than to inflame the jury and divert it from deciding the case on relevant evidence concerning the crime and the defendant."  <u>Id.</u>  This portion of the holding in <u>Booth</u> was not overruled by the Supreme Court in <u>Payne</u>.  <u>See Payne</u>, 501 U.S. at 830 n.2, 111 S.Ct. at 2611.

In her written statement to the jury, Stacie Bagley's mother directed the following statement to the Appellants: "I'm sorry for you, for your heart to be so hard, you couldn't even see the innocence of the two you've killed."  Stacie Bagley's father testified:

> I truly believe that on June 21st, 1999, our children were tragically and recklessly stolen from us.  There was no profit to be gained, no angry exchange, it was just a useless act of violence and a total disregard of life.

24

> Stacie and Todd saw a chance to witness to two young people placing themselves in harm's way.

These statements characterize the Appellants, and offer opinions about the nature of their crime. We are bound by <u>Booth</u> to find such evidence inadmissible. Furthermore, the error in admitting such testimony was plain. However, Appellants have not demonstrated that the error affected their substantial rights. These brief statements did not alone unduly prejudice the jury. <u>Cf.</u> <u>Payne</u>, 501 U.S. at 832, 111 S.Ct. at 2612 ("[S]urely this brief statement did not inflame [the jury's] passions more than did the facts of the crime . . . .") (O'CONNOR, J., concurring). Furthermore, any prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy. We reiterate that we presume that the jury followed its instructions. <u>U.S. v. Tombin</u>, 46 F.3d 1369, 1391 (5th Cir. 1995). Taken in context, this inadmissible portion of the victim impact testimony was short and mild compared to the horror of the crimes and the pathos of the admissible impact on the parents.

### E. Challenges to the Aggravating Factors

Appellants next challenge several of the aggravating factors submitted to the jury: (1) that "the defendant[s] committed the offense in an especially heinous, cruel or depraved manner in

that it involved torture or serious physical abuse of the victim,"
set forth in 18 U.S.C. § 3592(c)(6); (2) that Bernard "is likely to
commit criminal acts of violence in the future which would be a
continuing and serious threat to the lives and safety of others,"
a non-statutory aggravating factor; and (3) that "the defendant[s]
committed the offense as consideration for the receipt, or in the
expectation of the receipt, of anything of pecuniary value," set
forth in 18 U.S.C. § 3592(c)(7).  We address each of the
aggravating factors in turn, noting at the outset that the jury
found additional aggravating factors as to each defendant, and that
these factors were all found unanimously.

### 1. "Especially heinous, cruel or depraved" crime

Bernard first argues, solely to preserve the issue for
further review, that the statutory "especially heinous, cruel or
depraved" aggravating factor was too broadly defined in the jury
instructions.  He concedes that the instructions submitted to the
jury on this aggravating factor are virtually identical to the
comprehensive instructions approved by this court in other cases.
See Hall, 152 F.3d at 414.  Bernard's overbreadth argument is
without merit.

Bernard also contends that the evidence is legally
insufficient to support the jury's finding regarding the
"especially heinous, cruel or depraved" aggravating factor.  As

with any criminal verdict, we review jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Tipton, 90 F.3d 861, 896 (4th Cir. 1996) (applying Jackson "rational trier of fact" standard to challenges to jury findings regarding aggravating circumstances);  United States v. McCullah, 76 F.3d 1087, 1107 (10th Cir. 1996) (same).

Bernard contends that his participation in the crime was not as a matter of law "especially heinous, cruel or depraved" because he "was neither present nor responsible for *most* of the acts and events which the Government and its witnesses urged as a basis for an affirmative finding of this factor."  Bernard's Brief at 50 (*emphasis added*).  It is true that Bernard was not present or responsible for every act of cruelty in this criminal episode. However, the record provides ample basis for a rational juror to conclude that Bernard engaged in actions that were "especially heinous, cruel or depraved" as defined by the district court. Knowing what was to be done with them, Bernard bought two cans of lighter fluid from a convenience store, and he voluntarily accompanied the gang as they drove the Bagleys to the murder scene. Bernard poured  lighter fluid all over the Bagleys' car while they

27

were alive, locked in the trunk. He set the car ablaze with Stacie Bagley unconscious, but still alive, in the trunk. Viewing the evidence in the light most favorable to the government, a rational trier of fact could find the existence of this aggravating factor beyond a reasonable doubt.

### 2. "Future Dangerousness"

Bernard also argues that the evidence is legally insufficient to support the jury's finding that he is likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others. Relying in part on Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187 (1994), Bernard contends that the fact of mandatory long-term incarceration alone weighs heavily against a finding of 'dangerousness' in the absence of some evidence that the defendant will continue to be violent even in prison. Further, given the limited nature and extent of his personal role in the murder of the Bagleys and his lack of any substantial prior criminal history, Bernard disputes that a rational jury could find him a future danger to society. Under the above-quoted limited test for sufficiency of evidence on appeal, we find no merit in these arguments.

Simmons does not hold that future dangerousness is irrelevant to a jury's sentencing decision when the defendant will be imprisoned indefinitely, but instead requires that this

28

aggravating factor be explained to the jury in the context of the defendant's ineligibility for parole. 512 U.S. at 169, 114 S.Ct. 2187. Simmons was applied correctly here, since the jury was informed that Bernard would be ineligible for parole. Moreover, the Eighth Circuit, sitting *en banc*, rejected a similar Simmons argument in United States v. Allen, 247 F.3d 741, 788 (8th Cir. 2001) (en banc) ("[Appellant] argues that the government asserted only that he would be a danger to society but not that he would be a danger in prison. Because the jury was informed of his ineligibility for parole, we find no basis for drawing such a distinction."). In any event, the government offered proof not only of Bernard's past record but also of his potential for violence in prison. At the sentencing hearing, Dr. Richard Coons, a forensic psychiatrist, testified concerning Bernard's propensity for violence in prison.[11] Based on Dr. Coons's testimony, the horrific facts of Bernard's participation in the crimes, and ample evidence of Bernard's gang membership and criminal activities,

---

[11] Specifically, Dr. Coons testified as follows:

A: If [a person] is a gang member on the outside [of prison], they'll be a member of a gang inside.

Q: All right. And being a member of a gang inside the prison, does that lead itself or lend itself to even more acts of violence?

A: Yes. Gangs [] band together for two reasons, basically, protection and control. The members of the gang will be asked to participate in criminal acts and violent acts. I mean, that's just the facts.

R.V. 24 at 3162-63.

29

including his participation in at least two dozen burglaries, a rational juror could find that Bernard posed a serious threat of future harm to others.

### 3. "Pecuniary Gain"

#### a.

A far more difficult question is presented by both appellants' challenge to this aggravating factor. Appellants contend that the statutory "pecuniary gain" aggravating factor, see 18 U.S.C. § 3592(c)(8), does not apply to this case and that the evidence is legally insufficient to support the jury's findings on this factor.[12]

The district court followed the language of §3592(c)(8) when it instructed the jury to determine whether each "defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." The court further instructed the jury that "[t]he phrase 'pecuniary value' means anything of value belonging to Todd A. Bagley or Stacie L. Bagley in the form of money, property or anything having economic value." The jury unanimously found the existence of this factor as to Bernard and Vialva.

---

[12] Appellants filed written objections to the proposed charge in the district court arguing that the "pecuniary gain" factor should not be submitted to the jury. Appellants argued that "the plain meaning of this aggravator is that the defendant must commit the offense because he exchanged his act of 'murder' for a promise of something of 'pecuniary value.'"

Citing <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1263 (10th Cir. 2000), Appellants argue that Congress intended to reserve application of the "pecuniary gain" factor to "scenarios where the expectation of pecuniary gain is from the actual killing [i.e., a murder-for-hire scenario] and not just the underlying felony [i.e., a robbery]." Appellants argue that Congress did not intend for the "pecuniary gain" factor to apply in every case in which the defendant acquires something of pecuniary value as a result of his involvement in a homicide. Instead, application of the "pecuniary gain" factor is limited to situations where "the murder itself was committed as consideration for, or in the expectation of, anything of pecuniary value." <u>Chanthadara</u>, 230 F.3d at 1263, 1264 (finding jury instruction erroneous where it "failed to specify the 'offense' to which it referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation.").

We agree with Appellants, and the Tenth Circuit, that the application of the "pecuniary gain" aggravating factor is limited to situations where "pecuniary gain" is expected "to follow as a direct result of the [murder]." <u>Chanthadara</u>, 230 F.3d at 1263 (citation omitted). Thus, this aggravating factor is only applicable where the jury finds beyond a reasonable doubt that the murder itself was committed "as consideration for, or in the

31

expectation of" pecuniary gain.  See Woratzeck v. Stewart, 97 F.3d 329, 334 (9th Cir. 1996) (discussing analogous "pecuniary gain" factor under Arizona death penalty statute, and explaining that "[t]he State needs to prove at sentencing that the killing was done with the expectation of pecuniary gain.  Even if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so.").

In light of this limitation, the evidence is legally insufficient to support application of the "pecuniary gain" factor in this case.  Appellants were not hired to commit the offense of murder, and they did not commit the offense "as consideration for" pecuniary gain.  Nor did Appellants commit the offense of murder "in expectation of pecuniary gain."  The government argues that the murders in this case were a "necessary step in finishing the car-jacking plan," and were therefore committed "in expectation of pecuniary gain."  The motivation for the murders, however, was unrelated to pecuniary gain.  Instead, Appellants sought to prevent the Bagleys from reporting their crimes to the police.  Since no pecuniary gain was expected to flow directly from the homicide, this aggravating factor should not have been considered by the jury in weighing whether to impose the death penalty.  The evidence is

32

insufficient to support application of the "pecuniary gain" factor on the basis of the facts presented by this case.

**b.**

We must next consider the effect of the invalid "pecuniary gain" aggravating factor on Appellants' death sentences. The FDPA provides that courts of appeals cannot vacate death sentences on the basis of errors that are harmless beyond a reasonable doubt. 18 U.S.C. § 3595(c)(2). "Harmless-error review of a death sentence may be performed in at least two different ways. An appellate court may choose to consider whether absent an invalid factor, the jury would have reached the same verdict, or it may choose instead to consider whether the result would have been the same had the invalid factor been precisely defined." Jones v. United States, 527 U.S. at 402, 119 S.Ct. at 2109 (citations omitted).[13] Applying the first of these methods, we conclude that the error is harmless beyond a reasonable doubt.[14]

---

[13] In United States v. Webster, 162 F.3d 308, 324 (5th Cir. 1999), decided a few months prior to the Supreme Court's decision in Jones, this court applied a slightly different test: "Our duty when the jury finds an invalid aggravating factor is to strike the factor and either reweigh the remaining factors or apply harmless error review. . . . In conducting a harmless error review [] we may inquire into whether, beyond a reasonable doubt, either (1) the death sentence would have been imposed had the invalid aggravating factor been properly defined in the jury instructions or (2) the death sentence would have been imposed absent the invalid aggravating factor."

[14] In Ring v. Arizona, ___ U.S. ___, 122 S.Ct. 2428 (2002), the Supreme Court has held that a jury must determine the existence of aggravating factors that would increase a sentence from imprisonment to the death penalty. Ring explicitly states, however, that the Court was not considering the state supreme court's authority to reweigh the aggravating and mitigating circumstances after

Elimination of the invalid pecuniary gain factor from consideration leaves two statutory aggravating factors as to Bernard and three statutory aggravating factors as to Vialva. The jury unanimously found the existence of the "especially heinous, cruel or depraved" and "substantial planning and premeditation" aggravating factors in their consideration of Bernard's sentence. 18 U.S.C. § 3592(c)(6) and (9). In addition to these, the jury unanimously found the existence of the "single criminal episode" aggravating factor in regard to Vialva's sentence. 18 U.S.C. § 3592(c)(13). The jury also unanimously found three non-statutory aggravating factors for both appellants: that they were likely to commit future acts of violence; that they caused injury, harm and loss to the families of the victims; and that they murdered the Bagleys for the purpose of preventing the victims from providing information to the police regarding the crime. In the government's closing argument to the jury in the sentencing phase, the pecuniary gain aggravating factor received less attention than any of the other aggravating factors. During the sentencing phase testimony, the government focused on the "especially heinous, cruel or depraved" nature of Appellants' crime and the harm done to the victims' families. Again, the pecuniary gain factor was not

---

it struck an aggravating factor. See Ring, 122 S.Ct. 2428, 2002 WL 1357257 at *9 n.4.

34

emphasized. The jury's findings of at least five other aggravating factors regarding each appellant, and hardly any mitigating factors,[15] compel the conclusion that the erroneous submission of the pecuniary gain factor was harmless beyond a reasonable doubt. We are confident that the jury would have imposed the same sentences even if the pecuniary gain factor had not been submitted for their consideration.

### F.    Challenges to the Mitigating Findings

Appellants next challenge the jury's findings regarding their ages as mitigating factors. At trial, it was undisputed that Bernard was eighteen and Vialva was nineteen at the time of the murders. The jurors, instructed to determine "the existence of each particular mitigating factor by a preponderance of the evidence," unanimously found that Appellants failed to prove that their age was a mitigating factor.[16] Based on <u>Eddings v. Oklahoma</u>[17]

---

[15]    The jury found no mitigating factors regarding Bernard. Ten of the twelve jurors found Vialva's abused childhood to be a mitigating factor. However, the jury rejected all other mitigating factors that were submitted regarding Vialva.

[16]    The Special Findings Form submitted to the jury stated:

**IV. PART FOUR - MITIGATING FACTORS**
    **Instructions:** For each of the following mitigating factors, indicate the number of jurors who find the existence of each particular mitigating factor by a preponderance of the evidence; if none of the jurors find by a preponderance of the evidence that a particular mitigating factor exists, write the number "0" in the blank provided:
        . . .
        IV(C) Christopher Vialva was nineteen at the time of the offense.

35

and related cases, Appellants argue that their sentences violate the Eighth Amendment because the jury arbitrarily and capriciously refused to acknowledge the existence of a mitigating circumstance that clearly existed.

This court has previously expressed doubt regarding its authority to review jury findings relating to mitigating factors. See Hall, 152 F.3d at 413. Hall questions whether a jury's failure to find the existence of a mitigating factor is subject to appellate review, since the FDPA does not require the jury to make special findings of the existence of, or degree of jury unanimity upon, mitigating factors. Id. Assuming, however, that we have such authority, we find no constitutional error in the jury's determination that Appellants' relative youthfulness was not a mitigating factor.

"Neither the FDPA nor Lockett and Eddings require a capital jury to give mitigating effect or weight to any particular evidence . . . There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves

---

Number of jurors who so find, if any      _____

IV(C) Brandon Bernard was eighteen at the time of the offense.
     Number of jurors who so find, if any      _____

In response to both questions, the jurors wrote "0" in the blank.

[17]      455 U.S. 104, 102 S.Ct. 869 (1982).

36

precluded from considering mitigating evidence." United States v. Paul, 217 F.3d 989, 999-1000 (8th Cir. 2000) (citing Boyde v. California, 494 U.S. 370, 386, 110 S.Ct. 1190 (1990)). In Paul, the Eighth Circuit found no constitutional error where six jury members refused to find the defendant's age a mitigating factor although it was undisputed that the defendant was eighteen at the time of his offense. Id. ("The jury was certainly not precluded from considering Paul's youthful age as a mitigating factor [and] Paul has not cited authority for the proposition that a jury is somehow *required* to give mitigating effect to any factor, let alone this one.").

Appellants contend that Paul is inapposite, because the form of the verdict here misled the jurors by allowing them to find – irrationally – that neither defendant was chronologically 18 or 19 at the time of the offense, and by then preventing them from considering youthfulness as a mitigating factor. We do not read the verdict form this way, and in any event, appellants did not object to the jury instructions or verdict form regarding this mitigating factor. The jury instruction accompanying the list of mitigating factors clearly tells the jury to consider whether each listed circumstance mitigates the defendant's culpability. Thus, they were instructed to write down the number of jurors, if any, who found that the fact that Christopher Vialva was nineteen at the

time of the offense was mitigating as to Vialva, and likewise for Bernard. The government plainly explained the impact of these questions in its closing argument.

The jurors necessarily decided that these appellants' ages were not mitigating, as they were entitled to do. While the defendants' tender years may lead a jury to exercise clemency, it need not do so. The jury had ample evidentiary basis to believe that these appellants' acts climaxed a pattern of gang activities and made them older, criminally, than their chronological ages. The jury did not have to balance youthfulness, since they did not regard it as mitigating, against the aggravating factors.

## G. Exclusion of Potentially Mitigating Evidence

Vialva contends that the district court impermissibly prevented him from introducing relevant mitigating testimony about a childhood incident of racial discrimination. Vialva's mother, Lisa Brown, testified extensively regarding her personal background and Vialva's childhood experiences. Ms. Brown described her sheltered childhood, her troubled and often abusive relationships with men and her difficult pregnancy with Vialva. She also discussed Vialva's childhood illnesses, his attention deficit disorder and Vialva's difficult familial relationships with his Mother's partners. Ms. Brown also testified about Vialva's struggle with his racial identity resulting from his having one

38

black and one white parent and various conflicts Vialva faced due to his mixed racial background.

Vialva now challenges the district court's rulings in the following exchange, which occurred after the testimony described above:

Q:   Is [Vialva] getting into fights?

A:   Yes.

Q:   And are those fights, you believe, the result of his mixed racial background?

A:   Yes.  There were kids that called him "zebra".

MR. FRAZIER: I'm going to object to that, Your Honor.  This witness wouldn't have --

THE COURT: It's speculation.  Sustain the objection.

R.V.24 at 2949-50.

Vialva contends that the district court violated his constitutional right to introduce relevant mitigating testimony by excluding Ms. Brown's testimony regarding this single incident of childhood racial harassment.  Vialva relies on Skipper v. South Carolina,[18] and related authority, arguing that the district court erred by precluding the sentencing jury "from considering, as a mitigating factor, any aspect of the defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death."  Skipper, 476 U.S. at 3, 106 S.Ct. 1669.  Vialva

---

[18]    476 U.S. 1, 106 S.Ct. 1669 (1986).

39

also asserts that the district court violated the FDPA by excluding Ms. Brown's testimony on the basis of speculation, because the FDPA provides that the rules of evidence cannot be used to exclude relevant mitigating information. 18 U.S.C. § 3593(c).

The district court's exclusion of Ms. Brown's speculative statements, even if error, is harmless beyond a reasonable doubt. As explained above, the district court allowed Ms. Brown to testify at length about the racial tension in Vialva's life. Additionally, the district court admitted expert testimony regarding the effect of racial harassment on Appellant.[19] In closing argument, Vialva's counsel, relying on the evidence of racial harassment, argued that

---

[19] Dr. Mark Cunningham, a forensic psychiatrist, testified as follows:

Q: Doctor, another thing that occurred in "Chris'" life - or Mr. Vialva's life was the fact that he was - considered himself of mixed race, and was confused about that in his childhood. Did you identify that as a risk factor in this case?

A: Yes, I did, that there was significant confusion, and at different times in his childhood, he identified himself as being white, and then later mixed, and then later black, and the psychological records showed evidence of a lot of turmoil and confusion about that very essential who am I kind of question.

Q: How does that affect a person?

A: Well, when it was accompanied by some bigotry that he experienced early in childhood and by some peer rejection, then that aggravated the effects of it, that there was not a peer group that he easily blended with, and that's a separate risk factor . . . In [Vialva's] case, he experienced some active peer rejection. When he's six years old and the other kids are calling him names and throwing rocks at him . . . then it isn't just that he feels different, although that's part of it, but that he is actively being discriminated against. . . .

R.V.24 at 3061-62.

40

Vialva's childhood racial experiences mitigated his moral culpability for his crime. The jury was not, therefore, precluded from considering racial discrimination and harassment as a potential mitigating factor in Vialva's background. In light of substantial evidence in the record regarding Vialva's racial background, any arguable error in the exclusion of one instance of childhood harassment was harmless. See Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 1824 (1987) (exclusion of relevant mitigating evidence invalidates death sentence unless such exclusion was harmless beyond a reasonable doubt).

### H.    Prosecutorial Misconduct

Vialva next contends that he was denied Due Process and a fair trial by repeated inappropriate comments by the prosecutor in his closing argument to the jury. During his closing argument to the jury, the prosecutor stated:

> But because the investigation was so thorough, it did not leave either be [sic] these Defendants or their attorneys with anything to work with. You heard the evidence. You heard the corroboration. You saw the physical evidence and the scientific evidence. . . . It left them with nothing, because the evidence is so overwhelmingly and so positive and so true as to the guilt of both of these Defendants for the crimes they've been charged with.
> So, what were they left to do? Defense Counsel were left with the opportunity - with - with nothing, so they had to try to create a doubt where one did not exist. And [defense counsel] spent, for the last hour to hour and a half, trying to convince you any way they can, any possibility, no matter how remote or extreme it would be,

41

to try to get someone on this jury to follow down a rabbit trail and take a red herring and somehow say, "Oh, I've got a doubt." Not based on facts, but based purely on conjecture and speculation. Ladies and gentlemen, if these guys had another hour, they'd be trying to convince you it's midnight outside right now.

The prosecutor continued to argue that defense counsel made up an "outrageous theory" out of desperation in an attempt to mislead the jurors. Vialva contends that the prosecutor's statements amount to an improper personal attack on defense counsel, denying Vialva a fair trial. Because Vialva's counsel failed to preserve error regarding most of the prosecutor's statements, he bears the burden of demonstrating that, all told, the prosecutor's statements constitute plain error. United States v. Gallardo-Trapero, 185 F.3d 307, 321 (5th Cir. 1999).

Improper prosecutorial comments constitute reversible error only where "the defendant's right to a fair trial is substantially affected." United States v. Andrews, 22 F.3d 1328, 1341 (5th Cir. 1994) (citation omitted). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." United States v. Iredia, 866 F.2d 114, 117 (5th Cir. 1989). The factors relevant to this inquiry are: "(1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of

the evidence of the defendant's guilt." <u>Andrews</u>, 22 F.3d at 1341 (citation omitted).

Vialva has failed to demonstrate error, much less plain error. The prosecutor's arguments, properly understood, attacked the strength of the defense on the merits, not the integrity of defense counsel. Moreover, the prosecutor had some latitude because the defense counsel accused the government of "paying for" some of its witnesses. Finally, the court instructed the jury twice not to consider the statements, arguments or questions by the attorneys as evidence. Given the strength of the prosecution's case against Vialva, these remarks could not have denied him a fair trial.

## I.  Cumulative Error

Vialva contends that he was denied a fair trial by the cumulative impact of errors in the punishment phase. Vialva's argument is based primarily on the district court's failure to properly instruct the jury on the pecuniary gain aggravating factor. As explained above, the error in applying the pecuniary gain factor is harmless beyond a reasonable doubt, and Vialva was not denied a fair trial. Vialva's cumulative impact argument is without merit.

## J.  Sufficiency of the Indictment

In supplemental briefing before this court, Bernard alleges that his sentence is unconstitutional because the grand jury did not find, nor did the indictment allege, the existence of mental state and statutory aggravating factors required by the FDPA for imposition of the death penalty. Bernard did not object at trial on this ground, and concedes that review is for plain error. The alleged error in the indictment is plain, according to Bernard, because <u>Ring v. Arizona</u>, ___ U.S ___, 122 S.Ct. 2428, 2002 WL 1357257 (2002) extended <u>Apprendi v. New Jersey</u>[20] to aggravating factors in capital cases. <u>Ring</u> did not hold that indictments in capital cases must allege aggravating and mental state factors. See <u>Ring</u>, 2002 WL 1357257 at *9 n.4 ("Ring does not contend that his indictment was constitutionally defective."). Even if <u>Apprendi</u> were applicable to this case, the alleged error in the indictment does not amount to plain error. See <u>United State v. Cotton</u>, ___ U.S. ___, 122 S.Ct. 1781, 1786-87 (2002) (explaining that <u>Apprendi</u> error in an indictment failing to allege a drug quantity was not plain error because the evidence of the drug quantity was "overwhelming").

**CONCLUSION**

---

[20]      530 U.S. 466, 120 S.Ct. 2348 (2000).

44

For the foregoing reasons, we find no reversible error in the convictions or capital sentences.  Accordingly, we **AFFIRM** the judgments of the district court.